IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**MARLENE ZIYA,**

      Plaintiff,                            No. 3:11-cv-01398-MO

         v.                              OPINION AND ORDER

**GLOBAL LINGUISTIC SOLUTION, et al.,**

      Defendants.

**MOSMAN, J.**,

      Defendant Thomas/Wright, Inc. ("Wright") moves to dismiss [190] *pro se* plaintiff

Marlene Ziya's claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

Defendant Global Linguistic Solution ("GLS") filed a separate Rule 12(b)(6) motion to dismiss

[193].   In my previous opinion resolving Rule 12(b)(6) motions, I dismissed several claims with

prejudice and several claims without prejudice.   For those claims that I dismissed without

prejudice, I provided an explanation of the deficiencies.   In the second amended complaint, Ms.

Ziya alleges entirely new claims, re-pleads claims that I previously dismissed with prejudice, and attempts to remedy some of the pleading deficiencies in those claims that I dismissed without prejudice.   None of her claims against Wright or GLS survive these motions to dismiss.   For the reasons explained below, Wright's and GLS's motions to dismiss [190] [193] are granted.

## BACKGROUND

In 2008, Ms. Ziya, a resident of Arizona, contacted GLS to inquire about a translation job. (Sec. Amd. Compl. [180] at 1.)   She eventually entered into a contract with GLS and Wright, GLS's Oregon-based subcontractor.[1]   (Wright Answer [64] ¶ 6; Wright Mem. [191] at 2; Foreign Service Agreement (the "Agreement") [22] Ex. 1 at 16.) The contract was for a term of one-year unless terminated earlier by either party.   (*Id.* [22] Ex. 1, Section 1.)

Ms. Ziya arrived in Iraq on May 5, 2009.   (Sec. Amd. Compl. [180] at 3.)   She worked as a translator in the G-2 office, which is the staff section responsible for military intelligence in a United States Army unit. (First Am. Compl. [16] ¶ 13; Serna Decl. [165] ¶¶ 3, 5.)   While in Iraq, Ms. Ziya says she was bullied and discriminated against by her supervisors and other employees.

In September 2009, Command Sergeant Major[2] ("CSM") Bernardo B. Serna of the United States Army, one of the G-2 office supervisors, met with Ms. Ziya and told her there were concerns with the quality of her work.   (Sec. Amd. Compl. [180] at 34–35; *see also* Serna Decl. [165] ¶¶ 3, 8.)   Later that month, CSM Serna and "GLS manager Jacques" met with Ms. Ziya and informed

---

[1] Ms. Ziya's complaint does not clearly address this issue; however, construed liberally, she does allege that she entered into a contract with GLS and Wright.   (*See* Sec. Amd. Compl. [180] at 1–2.)   That contract is called a "Foreign Service Agreement," and I consider it in this motion.   The agreement is signed by an authorized representative of Wright, an authorized representative of GLS, and Ms. Ziya. Wright filed an answer to the complaint and admitted that it entered into a one-year contract with plaintiff, unless terminated by either party. (Wright Answer [64] ¶ 6.) Wright also stated in its briefing that "[p]laintiff entered into a Foreign Service Agreement with GLS and Wright on March 26, 2009." (Wright Mem. [191] at 2.)   Because GLS has not filed an answer, I am unable to determine whether GLS admits that it entered into a contractual relationship with plaintiff.   But whether Ms. Ziya *in fact* entered into a contract with GLS is not the question before me at this stage of the proceedings.   Instead, I must determine whether she *alleges* that she entered into a contract with GLS. I find that she does.

[2] CSM Serna was the G-2 Sergeant Major.   I previously referred to him as Sergeant Major ("SGM") Serna. (*See* Opinion and Order [152].)

her she was "released." (Sec. Amd. Compl. [180] at 37.)    Several days after that, Ms. Ziya met

with "GLS personnel Perez" and completed her resignation papers.    (*Id*. [180] at 42.)

Ms. Ziya then returned to the United States.    She alleges that Wright refused to pay for the

return trip. (*Id*. [180] at 47.)    During her trip home, she contacted GLS and Wright to ask for her

job back. (*Id*. [180] at 44.)

Upon returning to the United States, Ms. Ziya felt ill, which she suspects was due to the flu

or stress or a "combination of many things."    (*Id*. [180] at 45.)    She continued to contact GLS and

ask for her job back.    (*Id*. [180] at 46.)    In the months that followed, Ms. Ziya described her

situation as "sever [sic] case of denial, hopeless, numb, suspicious and no belief in this system . .

.." (*Id*. [180] at 47.)

In the fall of 2010, Ms. Ziya filed a complaint in the District Court of Arizona alleging

breach of contract and a variety of torts. (Compl. [6].) That complaint was dismissed without

prejudice for lack of subject matter jurisdiction and the court advised her that an amended

complaint must comply with Federal Rule of Civil Procedure 8. (Order [9].)    Ms. Ziya requested

several extensions of time and eventually filed her amended complaint [16] on January 25, 2011.

The court transferred [52] her case to the District of Oregon on November 18, 2011.

Since that time, Ms. Ziya has appealed to the Ninth Circuit twice, has filed many motions,

and has amended her complaint a second time.

## LEGAL STANDARD

### I.      Failure to State a Claim Pursuant to Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure

to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A pleading that offers only "labels and

conclusions" or "'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Id.* (quoting *Twombly*, 550 U.S. at 555, 557).

When reviewing a motion to dismiss, the court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).   The court construes *pro se* pleadings "liberally," affording *pro se* plaintiffs the "benefit of any doubt." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010).   However, the court's liberal interpretation of a *pro se* complaint "may not supply essential elements of the claim that were not initially pled."   *Ivey v. Bd. of Regents of Univ. of Alaska*, 673 F .2d 266, 268 (9th Cir. 1982).

## DISCUSSION

In her second amended complaint [180], Ms. Ziya asserts claims against CSM Serna of the United States Army, Sergeant First Class ("SFC") Susan Letendre of the United States Army, Wright, and GLS.   This opinion concerns the motions to dismiss filed by Wright and GLS and the claims against them.[3]   Many of the claims that Ms. Ziya now asserts against Wright and GLS are barred because I previously dismissed them with prejudice. The other claims she asserts fall short of stating a claim for which relief may be granted.   Because Ms. Ziya has already had two opportunities to amend her complaint and has failed to state a claim against GLS or Wright, I dismiss her claims against these defendants with prejudice.

### I.    Discrimination, Sexual Harassment, Retaliation

Title VII of the Civil Rights Act prohibits employment discrimination based on race, sex, religion, and national origin. This includes sexual harassment. It also prohibits an employer from retaliating against an employee who brings a claim for employment discrimination. Before a court

---

[3] I previously substituted [88, 235] the United States as defendant in place of CSM Serna and SFC Letendre. Earlier today, I informed [235] the United States that if it intends to file a motion to dismiss, it must do so within 30 days.

can consider a Title VII claim, the plaintiff must exhaust her administrative remedies by filing an administrative charge with the Equal Employment Opportunity Commission within 180 days after the allegedly illegal employment practice.   *See* 42 U.S.C. § 2000e-5(e)(1);   *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1099 (9th Cir. 2002).   Generally, a plaintiff must also obtain a right-to-sue letter.   *See Surrell v. Cal.Water Serv. Co.*, 518 F.3d 1097, 1105 (9th Cir. 2008).

Previously, I dismissed with prejudice Ms. Ziya's discrimination, sexual harassment, and retaliation claims against Wright and GLS.   (Opinion [134] at 5–6.)   I found that Ms. Ziya failed to exhaust her administrative remedies and to receive a right-to-sue letter before she filed this suit. Because she had failed to obtain a right-to-sue letter, I concluded that I did not have subject matter jurisdiction and dismissed her claim with prejudice.   (*Id.* [134].)   However, failure to obtain a right-to-sue letter does not necessarily preclude federal jurisdiction.   *See Surrell*, 518 F.3d at 1104.   Nevertheless, Title VII requires that plaintiffs pursue administrative remedies as a condition precedent to bringing a Title VII claim.   *See Temengil v. Trust Territory of Pac. Islands*, 881 F.2d 647, 654 (9th Cir. 1989).   The requirement is subject to waiver, estoppel, and equitable tolling.   *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).   None of these considerations apply to this claim.   Therefore, I reaffirm my order that this claim is dismissed with prejudice with the clarification that the basis is that Ms. Ziya failed to pursue administrative remedies and obtain a right-to-sue letter and I find no basis to excuse these failures.

Now, Ms. Ziya attempts to re-plead a "Claim of Discrimination based on sex/status/national origin/race/religion/and or retaliation/Sexual harassment." (Sec. Amd. Compl. [180] at 67–68.)   Wright and GLS move to dismiss this claim on the ground that I have already dismissed this claim with prejudice and, therefore, plaintiff may not re-plead it.   (Wright Mem.

[191] at 15; GLS Mem. [194] at 3 n.1.)   I agree and reaffirm my order dismissing the claim with prejudice.

## II.    <u>Hostile Work Environment</u>

Like claims alleging employment discrimination based on race, sex, religion, and national origin, or claims alleging sexual harassment or retaliation, a claim for hostile work environment is cognizable under Title VII of the Civil Rights Act.   *See Meritor Savings. Bank v. Vinson*, 477 U.S. 57, 66–67 (1986).

Wright moves to dismiss this claim on the bases that it is barred by the statute of limitations, the claim was previously dismissed with prejudice and is barred by the doctrine of *res judicata*, and if it was not previously dismissed with prejudice, it should be now because Ms. Ziya failed to exhaust her administrative remedies.   (Wright Mem. [191] 15–17.)   GLS does not specifically move to dismiss this claim, although it generally moves to dismiss all claims previously dismissed with prejudice.   (GLS Mem. [194] at 3 n.1.)

My earlier opinion on Ms. Ziya's Title VII claim and my discussion in this opinion regarding Ms. Ziya's claim arising under Title VII apply to her claim of hostile work environment against Wright and GLS.   Her second amended complaint does not describe how her hostile work environment claim is any different from her discrimination, sexual harassment, and retaliation claim.   She did not exhaust her administrative remedies and did not receive a right-to-sue letter before she filed this suit.   Therefore, I dismiss with prejudice Ms. Ziya's hostile work environment claim.

## III.    <u>Violating Public Policy</u>

Ms. Ziya attempts to allege a claim for violation of public policy against Wright and GLS. Her allegation states, in its entirety:

> Claim of violating public policy against T/W, GLS, Bernardo Serna As for reasons explained in all of this complaint above I seek remedies for Violating public policy against T/W, GLS, and Bernard Serna for what I lost from not working in Iraq from Sept. 26, 2009 to end of war DEC. 30, 2011 in lost salary, bonuses, vacation pay, transportation and all in an amount of $400, 000 from each defendant, plus reimburse past unpaid travel fees of about $1500 plus $10,000 in pad IRS tax Also Punitive damage in amount more than $100,000 or more as seen fit from each defendant.   Also Defendant to pay total legal court filing fees, mail plus the cost of expert witnesses and travel

(Sec. Amd. Compl. [180] 65–66.)

Ms. Ziya styles the claim as "violating public policy," and offers only labels and conclusions.   She does not attempt to recite the elements of the claim that she intended.   It is entirely unclear from the allegation whether Ms. Ziya intends to state a claim under federal or Oregon law.   Her reference to the "reasons explained in all of this complaint" also provides little guidance.   Ms. Ziya's complaint is lengthy and convoluted.   Without more guidance from Ms. Ziya, it is impossible to determine exactly which portions of those pages she believes are applicable to this claim.

Although GLS does not specifically address this claim in its brief, it moves for dismissal of her complaint on the general basis that she has not and cannot state a claim for which relief may be granted.   (GLS Mem. [194] at 3.)   Wright construes Ms. Ziya's allegation as an attempt to assert a claim that arose out of her termination under Oregon law.[4]   Wright moves to dismiss it on the

---

[4] Under Oregon law, "[t]he elements of a wrongful discharge claim are simple: there must be a discharge, and that discharge must be 'wrongful.'" *Moustachetti v. Oregon*, 319 Or. 319, 325, 877 P.2d 66, 69 (1994).   "A discharge is considered 'wrongful' under only two scenarios: (1) when the employee is discharged for fulfilling an important public or societal obligation, or (2) when the employee is discharged for exercising an employment-related right of important public interest."   *Pullela v. Intel Corp.*, 2010 WL 2942401, at *11 (D. Or. May 6, 2010) (citing *Lamson v. Crater Lake Motors, Inc.*, 346 Or. 628, 636, 216 P.3d 852, 856 (2009)).   To determine "whether the job-related right reflects an important public policy, [the court] look[s] to constitutional and statutory provisions, as well as to the case law of [Oregon] and other jurisdictions." *Yeager v. Providence Health Sys. Or.*, 195 Or. App. 134, 140, 96 P.3d 862, 865–66 (2004).   Ms. Ziya alleges she was terminated based on "unproven accusations from the GLS managers and Serna" about the quality of her work and her insubordination.   (Sec. Amd. Compl. [180] at 54.) Disagreeing with your employer about the perceived quality of your work and obedience to authority is not enough to state a wrongful discharge claim.   Ms. Ziya fails to allege any employment-related right she was exercising that reflects an important public policy.   She also fails to allege she was discharged for fulfilling an important public or

basis that it was dismissed with prejudice along with plaintiff's retaliation claim. In the alternative, Wright moves to dismiss this claim with prejudice because plaintiff failed to exhaust her administrative remedies.   (Wright Mem. [191] at 8–11.)

This allegation does not even come close to stating a claim.   Even construing these *pro se* pleadings liberally, as I must, this claim does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).   Plaintiff has already been given two opportunities to amend her complaint.   Therefore, I dismiss with prejudice Ms. Ziya's public policy claim.

### IV.    Fraud

GLS and Wright move to dismiss Ms. Ziya's fraud claim because she fails to state a claim and does not satisfy Federal Rule of Civil Procedure 9(b), which requires that a fraud claim specifically allege the circumstances that constitute the fraud. (Wright Mem. [191] at 11–12; GLS Mem. [194] at 7–9.)   As I previously explained, to state a claim for fraud, her complaint must allege facts about the time, place, and content of the fraudulent statement.   *See Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1042 (9th Cir. 2010). Ms. Ziya's second amended complaint does not allege specific facts about the time, place, or content of the fraudulent statement to support this claim against either GLS or Wright.   Because I previously gave Ms. Ziya an opportunity to cure these deficiencies and she has failed to do so, I dismiss this claim against both defendants with prejudice.

### V.    Intentional Infliction of Emotional Distress

To prevail on an intentional infliction of emotional distress ("IIED") claim under Oregon law, plaintiff must prove: "(1) the defendant intended to inflict severe emotional distress on the

---

societal obligation.   This is fatal to her claim.   In any event, I also find that she did not state a claim under Oregon law or federal law under *Iqbal* and *Twombly*.

plaintiff, (2) the defendant's actions caused the plaintiff severe emotional distress, and (3) the defendant's actions transgressed the bounds of socially tolerable conduct." *Schiele v. Montes*, 231 Or. App. 43, 48, 218 P.3d 141, 144 (2009).   I previously instructed Ms. Ziya that she must allege specific facts as to each element in her complaint and informed her that she had failed to allege specific facts that demonstrated that either GLS or Wright behaved in an outrageous fashion.   I also informed her that terminating her employment is not sufficiently outrageous behavior.

Wright moves to dismiss this claim on the grounds that (1) Ms. Ziya fails to plead any facts that demonstrate that any of Wright's conduct was objectively outrageous, and (2) she fails to allege any facts that demonstrate the requisite intent to cause emotional distress.   (Wright Mem. [191] at 12–14.)   In addition, Wright specifically argues that terminating her employment and requiring translators to sleep in tents when working in a war zone does not transgress the bounds of socially tolerable conduct.   (Wright Mem. [191] at 13.)   Other than the last ground, GLS asserts essentially the same arguments in its motion to dismiss.   (GLS Mem. [194] at 9–11.)

Ms. Ziya added many pages to her complaint but did not specify which facts she felt amounted to GLS or Wright behaving in an "outrageous" fashion.   The focus of her complaint seems to be on her termination and the events that followed it, although the complaint is unclear about what happened and the timing of the events.

According to Ms. Ziya, she had "the days off from Sept. 20 to Sept. 22," which were the days closely following the day she was "released."   (Sec. Amd. Compl. [180] at 37–38.)   I gather that on September 22, 2009, two individuals (neither of them named defendants) came to Ms. Ziya's room. (*Id.* [180] at 39.) She told them that she wanted to go to the EEOC and they escorted her, carrying guns. (*Id.* [180] at 39–40.)   When they returned to her room, the two individuals waited outside her door while she changed and packed her things.   (*Id.* [180] at 40.)   Later, Mr.

Perez arrived at her room but did not say anything to Ms. Ziya.   (*Id.* [180].)   At this point, Mr.

Ziya digresses to a complaint about CSM Serna and an explanation of her "mix[ed] emotions." (*Id.*

[180].)   Then, Ms. Ziya explains that GLS wanted her to "sleep and live in a small bed in the tent"

where two other women already were staying, one of which was asleep. (*Id.* [180] at 41.)   Ms.

Ziya stated that she was displeased with the quality of her accommodations and unhappy to be

sharing a tent with two other women. (*Id.* [180] at 41.)   Ms. Ziya does not make clear whether she

actually had to stay in the tent.   After expressing her frustrations, Mr. Perez took her to his office.

(*Id.* [180] at 42.)   There, Ms. Ziya remembers that he showed her resignation papers, but she

cannot remember whether she signed the papers, although she acknowledges they are now signed.

(*Id.* [180] at 43.)   Then, and her complaint does not state exactly when, Ms. Ziya was sent home.

(*Id.* [180] at 44.)   She claims "[t]hey sent [her] out with 500-1000 Pounds of heavy bags" which

she "[carried] through out the trip to Kuwait, London, and Georgia, sometimes dropping it on [her]

legs."   (*Id.* [180] at 44.)

Under Oregon law, "[l]iability for [intentional infliction of emotional distress] has been

found only where the conduct has been so outrageous in character, and so extreme in degree, as to

go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable

in a civilized community.'" *House v. Hicks*, 218 Or. App. 348, 358, 179 P.3d 730, 736 (2008)

(quoting Restatement (Second) of Torts § 46 Comment d (1965)).

I find that Ms. Ziya's allegations fall short of demonstrating that GLS or Wright behaved in

an outrageous fashion.   I also find that she failed to allege that either defendant had the requisite

intent for this claim.   Her memory of her termination is admittedly unclear.   But the reason for

her termination, at least in her mind, is not.   She denies that she was insubordinate and alleges she

was terminated because her employers believed she did not deliver high quality work, even though

she believed she was better than other translators.    This is a typical employment situation, not an outrageous one.    Her frustration with the change in living accommodations also falls short, particularly considering that her allegations do not state whether she was ever even required to stay in the tent or whether her complaints resulted in different accommodations.    Even if she was required to stay in the tent, the context is important.    She was working in Iraq, and her complaint makes clear that other individuals there also slept in tents. Considering the dates she provides throughout the complaint, even if she was required to stay in the tent, she was only there for a few days at most before beginning her trip home.    Finally, her allegation that she carried 500–1000 pounds of heavy bags throughout various airports is implausible.

Because Ms. Ziya fails to allege new facts that demonstrate that either GLS or Wright behaved in an outrageous fashion, and fails to allege facts that demonstrate the requisite intent, I dismiss with prejudice her IIED claim against GLS and Wright.

### VI.    Breach of Contract

I previously dismissed without prejudice Ms. Ziya's claim of breach of contract against both GLS and Wright [134].    I instructed Ms. Ziya that to state a sufficient breach of contract claim, she must allege facts that demonstrate the formation of a contract, the terms of that contract, which terms the defendants failed to honor causing the breach of the contract, and the damages she suffered because of that breach.

In her second amended complaint, Ms. Ziya only alleges a claim of breach of contract against Wright, not GLS, in her "claims" section of the complaint.    (Sec. Amd. Compl. [180] at 65.)    However, I acknowledge that there could be some confusion regarding whether I previously dismissed Ms. Ziya's breach of contract claim against GLS with or without prejudice.[5]    As a

---

[5] The prior opinion [134] contained an internal inconsistency.    In the summary of my rulings, I indicated that I dismissed the breach of contract claim against GLS *with* prejudice.    However, when I actually discussed the

practical matter, Ms. Ziya plainly ignored my rulings on several of her other claims that I

dismissed with prejudice and asserted them again in the second amended complaint.   Therefore, I

find it unlikely that any confusion about my rulings led to her choice not to assert this claim against

GLS in her second amended complaint.   Nevertheless, I am construing her pleadings liberally.

And, as I described in footnote 1, I find that Ms. Ziya alleges that she entered into a contract with

both Wright and GLS.   Therefore, I assume Ms. Ziya intended to state a breach of contract claim

against Wright and GLS.

     GLS moves to dismiss on the basis that plaintiff may not re-plead a claim that was

dismissed with prejudice.   (GLS Mem. [194] at 3 n.1.)   Wright moves to dismiss this claim on

the bases that "she does not point to any provisions of the contract that Wright allegedly breached"

and that she failed to meet the Rule 8 pleading standard to put Wright on notice as to what it must

defend.   (Wright Mem. [191] at 5–7.)

### A. *Section 3(i): Lodging*

     First, Ms. Ziya alleges Wright breached provision 3(i) by not giving her a proper place to

live and sleep.   (Sec. Amd. Compl. [180] at 52–53.)   Section 3(i) states, in its entirety:

> Lodging:  The Employer will provide all housing for the Employee during the
> term of this Agreement.   Therefore, the Employee is not eligible for any form of
> compensation for lodging during the term of this Agreement.

(Agreement [22] Ex. 1, Section 3(i).)   Ms. Ziya's allegations fail to show how this provision could

have possibly been breached.   She never alleges that she was not provided with housing.   She

alleges only that she did not like moving from her room to a tent after her termination.   Nothing in

this provision sets any standard for the housing.   Furthermore, in later sections of the contract,

Ms. Ziya is informed that "[l]iving conditions at the assignment location could be remote and

---

breach of contract claim, I dismissed it against both GLS and Wright *without* prejudice.   I intended to dismiss the
claim against GLS without prejudice.

uncomfortable." (*Id.* [22] Ex. 1, Section 10(a)(2).)    I find Ms. Ziya's allegations do not amount to a breach of contract claim.

### B.    *Section 8: Daily Working Status*

Second, she alleges a breach of Section 8 stating that GLS violated the contract "by not providing [her with] any support." (Sec. Amd. Compl. [180] at 53.) This section of the contract explains that the "Employee will be performing duties in connection with work the Employer is tasked to perform under [a contract] assigned to GLS.   The Employee will receive all day-to-day working directions and required support from the Employee's supervisor."   (Agreement [22] Ex. 1, Section 8.)   Her allegations are once again vague and conclusory.   Essentially, she alleges that she asked for help and support and did not receive it.   Her most specific allegation is that she asked her manager a "simple question" and he gave her the "wrong answer," but she provides no further details.   I find Ms. Ziya's allegations do not amount to a breach of contract claim.

### C.    *Section 10(a)(1): Liability*

Third, she alleges a breach of Section 10(a)(1), stating that the "contract implies to hostility from enemy and terrorist of host country not from GLS and US workers, I was working with them and my door being attacked by them."   (Sec. Amd. Compl. [180] at 53.)   Section 10 concerns liability.   (Agreement [22] Ex. 1, Section 10.)   The provision informs the employee that "it is possible that your assignment or possible business travel to the Host Country will entail some degree of personal hardship and danger."   (*Id.* [22].)   The employee is warned that "[s]poradic combat" and "criminal or terrorist activities" may occur. (*Id.* [22].)   The employee is also warned that other "war risk conditions" such as landmines and booby-traps will exist. (*Id.* [22].) Even construed liberally and in the light most favorable to her, Ms. Ziya's allegations do not amount to a breach of Section 10.

### D.     *Section 12: Conduct of Employee*

Fourth, she alleges that other contractors were violating the ethical rules of the contract as described in Section 12 but that she did not. (Sec. Amd. Compl. [180] at 54.)   Section 12 concerns the conduct of employees.   It lists requirements placed on the employee, not the employer.   It concludes by stating that "[F]ailure of an Employee to abide by any provision of this paragraph, as solely determined by the Employer, is grounds for termination for cause pursuant to Paragraph 16.a." (Agreement [22] Ex 1. Section 12.)   Ms. Ziya's allegation that others violated this provision but that she did not does not amount to a claim for breach.

### E.     *Section 10(a)(6)(c) & 11: Liability and Benefits*

Fifth, Ms. Ziya alleges that Wright breached the contract by failing to continue to provide her with health insurance after she was terminated.   (Sec. Amd. Compl. [180] at 57.)   She cites Sections 10(a)(6)(c) and 11.   Section (10)(a)(6)(c) states, in applicable part:

> The Employee agrees that neither the Employer nor its affiliates will be liable in the event of death, injury, or disability to Employee.   The Employer will make available to the Employee insurance benefits and the Employee agrees to accept these insurance benefits as full satisfaction of any claim(s) for death, injury or disability . . . .

(Agreement [22] Ex 1. Section 10(a)(6)(c).)   Ms. Ziya alleges that she was not provided with health insurance after she was terminated.   She does not allege that Wright failed to provide her with the insurance benefits described in this section while she was employed.   Nothing in this provision states that the Employer will continue to provide insurance after termination. Moreover, the insurance benefits it describes concern death, injury, or disability, not health insurance.   Therefore, Ms. Ziya fails to state a claim for breach of this provision.

Section 11 states:

> During the term of this Agreement, the Employer will make available Defense Base Act (DBA) Insurance as well as other group insurance plans.   Should the

> Employee suffer any medical condition which requires treatment, payment for such treatment will be provided consistent with the respective policy terms and conditions.

(Agreement [22] Ex 1. Section 11.)   Again, nothing in this provision states that the Employer will continue to provide insurance after termination.   Ms. Ziya seems to acknowledge that she had health insurance while she was employed by alleging that she learned it had "expired" after her last day of employment. (Sec. Amd. Compl. [180] at 45.)    In addition, Ms. Ziya admits she learned about COBRA, but "it [wa]s expensive." (*Id*. [180].)   As a result, I find that Ms. Ziya fails to state a claim for breach of this provision.

### F.    *Section 16: Termination*

Ms. Ziya also alleges that Wright violated Section 16, the termination provision, by failing to pay for her transportation costs for her return trip to the United States and by terminating her based on lies about the quality of her work and insubordination.   Based on these alleged breaches, she claims she is entitled to payment for all of the time that she "could have been working in Iraq . . . , plus bonuses and vacations and transportation expenses, plus dental work and any medical expenses, Plus pay [her] back the 10k [she] paid in IRS because [she] didn't stay for one year or more."   (*Id*. [180] at 55.)

As a preliminary matter, it is necessary to determine whether Ms. Ziya's employment was at-will or just cause.   Oregon is an employment-at-will state, meaning that "[g]enerally an employer may discharge an at-will employee at any time and for any reason, absent a contractual, statutory or constitutional requirement [to the contrary]."   *Sheets v. Knight*, 308 Or. 220, 230, 779 P.2d 1000, 1006 (1989) (quoting *Patton v. J.C. Penney Co*., 301 Or. 117, 120, 719 P.2d 854, 856 (1986)) (alterations in original).   "Employers, however, are free to alter the usual at-will condition

of employment by an agreement to the contrary." *Ewalt v. Coos-Curry Elec. Co-op., Inc*., 202 Or. App. 257, 262, 120 P.3d 1288, 1291 (2005).

Ms. Ziya does not specifically allege whether her employment is at-will or whether she may only be terminated for just cause. Her contract stated that it "ends upon the successful completion of **one (1) year** unless terminated earlier by either party pursuant to Paragraph 16, Termination." (Agreement [22] Ex 1, Section 1.) The Termination section of the contract stated there are three categories of termination: termination for cause, voluntary termination by employee, or termination without cause. If she was terminated without cause, then she is entitled to return transportation, payment for accrued leave, and a pro-rated completion payment. (*Id.* [22] Ex 1, Section 16(c).) However, if she was terminated for cause or she voluntarily terminated, she was not entitled to these benefits.

I conclude that Ms. Ziya alleges she was terminated pursuant to the "termination for cause" provision of the contract.[6]  The complaint states:

> Also the employer didn't terminate my employment for no cause, there were causes, My employment was terminated at the employer's fault caused by false unproven accusations from the GLS managers and Serna, desperate and hostile work environment, improper degrading company lodging, discriminations toward me, bullying, humiliations, GLS accepting lies about from Serna about me without proves, lies that he told them about my work several times but I didn't follow!

(Sec. Amd. Compl. [180] at 54.) According to the contract, when an employee is terminated for cause, the employee is responsible for his or her own transportation costs, and his or her remuneration will cease on the discharge date. (*See* Agreement [22] Ex. 1, Section 16(a), (d).)

---

[6]  In addition, Wright states she was terminated for cause. (Wright Mem. [191] at 8.) ("Wright acted within the bounds of the Agreement in terminating Plaintiff for cause.") Ms. Ziya's allegations also state, "Article 16 B page 13 of contact, for voluntary discharge it has to be with 15 days notice, I didn't give 15 days notice." (Sec. Amd. Compl. [180] at 55; *see also* Agreement [22] Ex. 1, Section 16(b).) I do not construe this as an allegation that she voluntarily terminated the agreement. Her allegation suggests that she may be in breach, rather than any defendant. Therefore, it does not benefit her.

16 – OPINION AND ORDER

Courts differentiate between at-will-employment contracts and "just cause" employment contracts.  *See Mobley v. Manheim Servs. Corp*. 133 Or. App. 89, 94–95, 889 P.2d 1342, 1345–46 (1995).   In the latter, "there must be some evidence of the existence of facts justifying the termination, which the employer believes and acts on in good faith."   *Id.* at 94, 889 P.2d at 1345; *see also Simpson v. Western Graphics*, 293 Or. 96, 643 P.2d 1276 (1982).   The same rule does not apply to at-will-employment contracts.   *See Mobley*, 133 Or. App. at 94–95, 889 P.2d at 1345– 46.)

Because this stage of the proceeding concerns motions to dismiss, I accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to Ms. Ziya.   On the facts Ms. Ziya alleges, a "just cause" employment agreement would entitle her to greater protection than she would enjoy as an at-will employee.[7]   Therefore, I assume, without deciding, that Ms. Ziya alleges that she was a party to a "just cause" employment agreement.

Ms. Ziya alleges a claim for breach of the duty of good faith and fair dealing separate from her claim for breach of contract.   If Ms. Ziya's claim for breach of the duty of good faith and fair dealing stood alone, it would be deficient under *Iqbal* and *Twombly*.   Her allegation states: "Claim of Breaches of Good Faith and Fair Dealing against defendant T/W As for reasons explained in all of this complaint above."   (Sec. Amd. Compl. [180] at 65.)   Thus, she only

---

[7]   If Ms. Ziya was an at-will employee, she has not alleged facts sufficient to state a claim. "Parties to an employment at will contract are not subject to the implied duty of good faith and fair dealing insofar as the right to terminate is involved. However, if the parties agree to restrict the right to terminate at will, the duty of good faith applies to the restrictive terms, as it does to the performance and enforcement of all of the contractual terms except the right to terminate itself."   *Elliott v. Tektronix, Inc*., 102 Or. App. 388, 396, 796 P.2d 361, 365 (1990).   Ms. Ziya does not allege that any restricted term was breached.   Nor does she reference any procedures relating to her termination that were not followed or any contractual protections during the termination process that she was entitled to that she did not receive.   In addition, Ms. Ziya does not allege any applicable statutory or constitutional requirement that would alter the general at-will employment rule that she could be discharged at any time and for any reason.

provides labels.  She does not explain which facts in the complaint support the claim.  This is not enough to survive a motion to dismiss.[8]

However, I assume that Ms. Ziya's allegations regarding her breach of contract claim apply to her breach of the duty of good faith and fair dealing claim.  Because her breach of contract claim involves the question of whether her employer acted in good faith when terminating her, I find it appropriate to simultaneously consider her claim for breach of the duty of good faith and fair dealing.  I have already stated that I assume Ms. Ziya intended to allege a breach of contract claim against GLS.  Although she does not allege a breach of the duty of good faith and fair dealing against GLS, for purposes of this analysis, I assume she intended to.

Considering the entirety of her complaint in the light most favorable to her and construing it liberally, Ms. Ziya attempts to allege a claim that she was terminated in bad faith because the grounds for her termination were based on lies.  Ms. Ziya believes she was terminated based on "unproven accusations from the GLS managers and Serna" about the quality of her work and her insubordination.  (*Id.* [180] at 54.)  Although Ms. Ziya's complaint does not tell a consistent story of how frequently she had warning that there were concerns about the quality of her work,[9] she does allege that CSM Serna met with her and informed her on September 17, 2009, that there were concerns with her work.  During that meeting, a translator pointed out two mistakes in her translations.  Ms. Ziya summarizes the meeting as follows:

---

[8] Wright moves to dismiss the breach of good faith and fair dealing claim on the basis that the duty is not applicable to its right to terminate Ms. Ziya.  (Wright Mem. [191] at 7–8.)  This argument assumes Ms. Ziya is an at-will employee.  If that were true, Wright's argument would be well-taken.  *See Elliott*, 102 Or. App. at 396, 796 P.2d at 365 ("parties to an employment at will contract are not subject to the implied duty of good faith and fair dealing insofar as the right to terminate is involved.")

[9] For example, she alleges: "I was threatened with transfer and fire many times during the 4 and ½ moths working in that office, by both Sue [Letendre] and Serna, even Brown the errand boy!  Again for no reason or for false accusations."  (Sec. Amd. Compl. [180] at 6.)  She also alleges, "I Was never told I was supposedly doing bad job till Sept. 17th 2009, that was the only one time, never before by Serna, not by Sue and not by Lindsay, and not be GLS managers."  (*Id.* [180] at 37.)

> Then in the meeting Serna felt the two alleged small mistakes were too small for all
> that drama so he continued saying that a general laughed at my work, that I wrote
> things without meaning, and that I had punctuation problem and I wasn't
> translating abbreviations, all these mistakes made by Rafiea and not me and I have
> told them about it before, he didn't show me any files to prove it was me doing that.
> later in termination paper he wrote that I was accusing others of bad work and
> lying.

(*Id*. [180] at 34–35.)   After the meeting, Ms. Ziya allegedly spoke with the translator who had

pointed out her mistakes.   He told her "Serna wanted me to make you look bad, if I didn't do what

he told me I would be fired."   (*Id*. [180] at 34.)

On September 18, 2009, Ms. Ziya predicted that she would be fired and started contacting

GLS.   She informed GLS that another translator was "messing up," not her.   (*Id*. [180] at 36.)

On September 19, 2009, CSM Serna and Mr. Jacques met with Ziya.   She was told she was

"released."   According to Ms. Ziya, "Jacques said he will be in few days to pick me to see if I will

be fired or transferred, he said 'fired' more affirmably."   (*Id*. [180] at 37.)   Ms. Ziya "raced to say

few things to save [her] job," but she did not feel CSM Serna and Mr. Jacques were swayed.   (*Id*.

[180] at 37.)

Days later, Mr. Perez brought her resignation papers. (*Id*. [180] at 42.)   At that meeting,

Mr. Perez allegedly told her to resign for personal reasons, but she decided not to write anything.

(*Id*. [180].)   She believes the "resignation file T/W has is full of lies and coercion, T/W stated in

this court case and to office of unemployment that I was fired for doing bad job and for

insubordination yet the paper says 're hirable.'" (*Id*. [180] at 46.)

When an employer agrees to just cause employment, the employer must make a

termination decision "in good faith, 'based on facts reasonably believed to be true and not for any

arbitrary, capricious, or illegal reason.'" *Gilbert v. Tektronix, Inc*., 112 Or. App. 34, 37, 827 P.2d

919, 920 (1992) (quoting *Simpson*, 293 Or. at 99, 643 P.2d at 1278.)

The determinative fact is who employed Ms. Ziya and who did not.   While Ms. Ziya makes broad statements about collusion among the defendants to terminate her based on lies, she specifically alleges only that her termination was based on lies told by CSM Serna and a translator at the direction of CSM Serna.   Ms. Ziya does not allege that GLS or Wright made up their own lies to form the basis of her termination.   The closest she comes to making that allegation is by describing a "GLS memo dated 9-22-2012 of lies." (Sec. Amd. Compl. [180] at 49.)   This memo is dated three years after her termination, and there is no allegation that any of the lies were reasons for her termination.   Moreover, all of the supposed lies are about her behavior *after* she was told she was being "released."   (*Id*. [180] at 50–51.)   Therefore, this memorandum is not enough.

According to the complaint, Wright and GLS trusted CSM Serna's opinion over Ms. Ziya's opinion of her own work and behavior.   CSM Serna was an employee of the United States Army. Her employers, Wright and GLS, believed him.   Ms. Ziya does not allege any facts to support that Wright or GLS did not act in good faith in believing him.   Nor does Ms. Ziya ever allege that her employer's grounds for terminating her, if true, would not constitute just cause.

Ultimately, Ms. Ziya's complaint adequately expresses her frustration with being terminated, but it does not state a claim.   As this was Ms. Ziya's third opportunity to state a breach of contract claim and she has failed to do so, I dismiss this claim against GLS and Wright with prejudice.   I also dismiss with prejudice her claim for breach of the duty of good faith and fair dealing against Wright.   She does not allege that claim against GLS, but if she had, I would dismiss it for the same reasons.

## VII.    Tortious Interference

Ms. Ziya asserts a claim for "tortious interference" against GLS and CSM Serna.   She does not allege this claim against Wright.   In Oregon, a tortious interference claim is more

commonly referred to as a claim for interference with economic relations.   *See Mannex Corp. v. Bruns*, 250 Or. App. 50, 51 n.1, 279 P.3d 278, 280 n.1 (2012).

Under Oregon law, to state a claim for interference with economic relations, a plaintiff must prove:   "(1) the existence of a professional or business relationship (which could include, *e.g.*, a contract or a prospective economic advantage), (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages." *McGanty v. Staudenraus*, 321 Or. 532, 535, 901 P.2d 841, 844 (1995).

GLS moves to dismiss on the basis that nowhere in her second amended complaint does Ms. Ziya set forth any specific facts related to the claim.   (GLS Mem. [194] at 12.)   In addition, GLS moves to dismiss on the basis that Ms. Ziya cannot show that GLS tortiously interfered with a contract when there is no allegation that a contract existed between Ms. Ziya and a third party. (*Id.* [194] at 12.)

In her attempt to assert a claim, Ms. Ziya states only that she brings a claim of "tortious interference . . . for the reasons explained in all of the complaint above."   (Sec. Amd. Compl. [180] at 68.)   She provides no explanation of where in the seventy page complaint to look for supporting facts.   She simply provides a label and states that the reasons are explained somewhere in the sprawling complaint.   I cannot find facts that state a claim for interference with economic relations against GLS that is plausible on its face.   For this reason, I dismiss the claim with prejudice.

In addition, Ms. Ziya fails to allege that GLS is a third party.   Instead, her allegations show that GLS is a party to the contract.   For this alternative reason, I dismiss this claim with prejudice.

## VIII.    Civil Conspiracy

"A civil conspiracy consists of (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as a result of the overt act or acts."  *Morasch v. Hood*, 232 Or. App. 392, 402, 222 P.3d 1125, 1131–32 (2009).   A civil conspiracy is not, however, "a separate tort for which damages may be recovered; rather, it is a way in which a person may become jointly liable for another's tortious conduct."  *Id.* at 402, 222 P.3d at 1132 (quotation omitted.)

GLS moves to dismiss the claim on the basis that plaintiff failed to allege any specific facts required to state a civil conspiracy claim.  (GLS Mem. [194] at 13.)   I agree.   Because Ms. Ziya asserts her claim of "tortious interference" and "civil conspiracy" together in the same paragraph, perhaps she intends to allege that CSM Serna and GLS were involved in a conspiracy related to the tortious interference claim.   But any attempt on my part to discern her intent on this matter would be pure speculation.   Therefore, I dismiss this claim with prejudice.

## IX.    Additional Claims

In her First Amended Complaint, Ms. Ziya also asserted defamation and assault claims against Wright and GLS.   I dismissed those claims without prejudice and explained the deficiencies in each.   Ms. Ziya does not assert these claims in her second amended complaint. That was her opportunity to do so.   Therefore, I dismiss her defamation and assault claims against both defendants with prejudice.

## X.    Illegal Termination Count

Several months after filing her second amended complaint, Ms. Ziya filed a separate "Motion to Add Illegal Termination Count Into the Complaint" [206]. Wright and GLS responded [211, 212] in opposition.   Ms. Ziya then filed two more documents [221, 227], explaining that she

accidentally filed the motion to add the illegal termination claim and asking to withdraw the motion.   Because Ms. Ziya did not intend to add an illegal termination claim, I GRANT the motion [221] to withdraw and DENY AS MOOT the motion [206] to add the illegal termination claim.

**CONCLUSION**

For the foregoing reasons, I GRANT defendant Wright's motion to dismiss [190] and defendant GLS's motion to dismiss [193].   All claims against these defendants are dismissed with prejudice.   Ms. Ziya's case continues solely against the United States.

IT IS SO ORDERED.

DATED this __9__ day of August, 2013.

/s/Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge